IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DAVID WARTHEN, | § | CV. NO. SA:14-CV-461-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| vs. | § | |
| | § | |
| | § | |
| AUTO TRUCK TRANSPORT USA, | § | |
| L.L.C., | § | |
| | § | |
| Defendant. | § | |
| _____ | § | |

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
<u>JUDGMENT</u>

Before the Court is a Motion for Summary Judgment filed by

Defendant Auto Truck Transport USA, L.L.C. ("Defendant") (Dkt. # 12).  The

Court held a hearing on the Motion on August 25, 2015.  At the hearing, Adam D.

Boland, Esq., represented Defendant; Lance C. Blankenship and Brian Levy, Esqs.,

represented Plaintiff David Warthen ("Plaintiff").  After careful consideration of

the supporting and opposing memoranda and the arguments presented at the

hearing, the Court, for the reasons that follow, **GRANTS** Defendant's Motion for

Summary Judgment.

<u>BACKGROUND</u>

This case arises out of Plaintiff's employment with Defendant as a truck transporter.  Plaintiff is African-American and resides in Las Vegas, Nevada. ("Warthen Dep.," Dkt. # 12-1 at 8:1–2.)  Defendant is a truck transport company that transports semi-trucks over the road to dealerships in the United States and Canada.  ("Johnson Dep.," Dkt. # 12-2 at 4:16–23.)  Plaintiff worked for Defendant from September 27, 1999, to some point in 2007 and again from 2010 to August 2, 2013.  (Warthen Dep. 14:18–15:11, 47:20–48:5.)  As a truck transporter for Defendant, Plaintiff drove a truck pulling semi-trucks, stacked "piggy-back style," and delivered the trucks to dealerships.  (<u>Id.</u> 14:1–14; Johnson Dep. 4:16–23.)

The events that form the basis of Plaintiff's claims began in March 2011.  Around this time, Scott Vallier ("Vallier"), Defendant's Vice President of Operations at the time, called Plaintiff regarding a customer complaint and was "rude and accusatory" and "very disrespectful" toward Plaintiff.  (Warthen Dep. 49:18–50:4, 51:1–9; "Vallier Dep.," Dkt. # 12-4 at 14:7–11.)  According to Plaintiff, during the call, Vallier "asked me did I know who he was?  And he also told me that no one talks to him and questions him."  (Warthen Dep. 52:6–13.) Plaintiff also complains of other calls from Vallier, which he characterizes as "harassing" and "very nasty and rude," in which Vallier told Plaintiff "not to

disrespect his customers" and to treat company employees with respect.  (Id. 42:7–43:25, 55:12–58:25.)  According to Plaintiff's testimony, Vallier further told Plaintiff "that he was going to show me and that he was going to keep me in my place."  (Id. 59:5–10.)

In June 2012, Plaintiff took bereavement leave to attend his father's funeral.  (Id. 69:15–18.)  Plaintiff was initially paid for this leave, but the money was subsequently deducted out of a later paycheck, and Plaintiff ultimately received no bereavement pay.  (Id. 70:11–71:11.)

Approximately a year later, on June 20, 2013, Plaintiff filed a grievance with the company alleging race discrimination and harassment.  (Id. 68:20–25.)  In July 2013, the company required Plaintiff to attend training on how to install and dismantle "light-bars," mounts for turn signal and brake light indicators, on the back of trucks being towed for delivery.  (Id. 79:12–80:18.)  According to Defendant, Plaintiff was one of approximately 200 employees that Defendant required to attend the light-bar training during this period.  (Vallier Dep. 12:9–17.)

On July 30, 2013, Plaintiff was not allowed to complete a delivery without inspection by the customer, a delivery procedure referred to as "subject to inspection."  (Warthen Dep. 99:11–23.)  While Plaintiff waited for inspection, two Caucasian drivers and one Hispanic driver were allowed to deliver their loads

without customer inspection at the same site.  (Id. 100:22–103:8.)  Whether to

accept a delivery without inspection is a decision made by the customer, and

Defendant has no control over whether a driver will be allowed to deliver a load

without a customer inspection.  ("Johnson Aff.," Dkt. # 12-5 ¶ 6.)

On August 1, 2013, Plaintiff was assigned a "breakdown load"[1] by

central dispatch.  (Warthen Dep. 139:14–23.)  Because he had been on the road for

several weeks and wished to return to Las Vegas to refill his blood pressure

prescription, Plaintiff told central dispatch that he needed to consult his union

representative regarding whether he had to take the breakdown load or could

instead be assigned a "home load," a load scheduled for delivery in the direction of

the driver's home.[2]  (Id. 139:18–140:9, 142:15–20.)  Plaintiff unsuccessfully

attempted to reach two union representatives before contacting Don Magill

("Magill"), the union shop steward in the San Antonio terminal.  (Id. 140:21–

141:12.)  Magill told Plaintiff that the union could not tell Defendant what work to

assign Plaintiff and encouraged Plaintiff not to not refuse the assignment.  ("Magill

[1] A breakdown load is a load in transit that cannot be delivered due to a mechanical
failure or other defect that must be repaired.  (Johnson Dep. 13:1–16.)  Defendant's
practice is to release the driver of the broken down load and to assign a new driver
through central dispatch to complete the delivery once repairs are completed.  (Id.
13:10–19.)

[2] If the home load delivery is not in the driver's hometown, Defendant pays for the
driver's remaining travel home.  (Johnson Dep. 10:9–20.)  The driver is then
responsible for the expense of traveling back to his home terminal.  ("Campbell
Dep.," Dkt. # 12-3 at 21:22–22:4.)

Dep.," Dkt. # 12-7 21:5–9.)  Plaintiff also contacted Betty Bowman, the truck supervisor at the San Antonio terminal, who told him that she did not have the authority to take him off the breakdown load.  (Warthen Dep. 148:3–149:17.)

On August 2, 2013, Tom Johnson ("Johnson"), the San Antonio terminal manager, called Plaintiff to ask whether he was refusing the breakdown load.  (Warthen Dep. 149:18–150:4; Johnson Dep. 24:16–20.)  Under the collective bargaining agreement governing Defendant's employees, refusing a work assignment is grounds for termination.  (Dkt. # 12-6, art. 23.)  Plaintiff responded that he was still waiting to speak to a union representative, and explained his need to refill his prescription.  (Warthen Dep. 149:18–150:9; Johnson Dep. 24:21–25:5.)  According to Defendant, Johnson offered to have the company provide Plaintiff with a rental car to get his prescription filled at a local pharmacy or to fly Plaintiff back to his home in Las Vegas.  (Johnson Dep. 25:3–11; Campbell Dep. 18:20–26:19.)  Plaintiff denies being offered a rental car and does not recall being given the option of flying to Las Vegas.  (Warthen Dep. 165:2–12.)  Johnson then conferred with Dane Campbell, Defendant's Vice President of Operations, and terminated Plaintiff after Plaintiff again failed to confirm that he would take the breakdown load.  (Johnson Dep. 19:1–19, 37:16–38:8; Campbell Dep. 13:9–25; Warthen Dep. 149:23–151:3.)

On October 29, 2013, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") through the Texas Workforce Commission Civil Rights Division claiming that he was forced to attend a training that no one else was required to attend on June 20, 2013, and that he was treated differently than his Caucasian co-workers in not being allowed to deliver a load without customer approval on July 31, 2013.  (Dkt. # 12-11.)  On February 26, 2014, Plaintiff filed a second Charge of Discrimination with the EEOC through the Texas Workforce Commission Civil Rights Division claiming that his complaints to Defendant had been ignored and that he was being retaliated against for filing a grievance complaining of racial discrimination.  (Dkt. # 12-12.) Plaintiff received notice of his right to sue for his respective claims on February 18, 2014, and May 2, 2014.  (Dkt. ## 1-1, 1-2.)

On May 16, 2014, Plaintiff filed a Complaint in this Court alleging claims of racial discrimination under 42 U.S.C. § 1981 and racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964.  (Dkt. # 1 at 5–6.) Defendant filed the instant Motion for Summary Judgment on May 29, 2015. (Dkt. # 12.)  Plaintiff filed a Response to the Motion on June 12, 2015 (Dkt. # 14), and Defendant filed a Reply on June 19, 2015 (Dkt. # 15).

## LEGAL STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P. Enterprises, L.L.C., 756 F.3d 875, 880 (5th Cir. 2014). "Substantive law will identify which facts are material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In seeking summary judgment, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the nonmoving party must come forward with specific facts that establish the existence of a genuine issue for trial. Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (internal quotation marks omitted).

In deciding whether a fact issue has been created, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not

make credibility determinations or weigh the evidence." Kevin M. Ehringer Enters. v. McData Servs. Corp., 646 F.3d 321, 326 (5th Cir. 2011) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

## DISCUSSION

### I.   Race Discrimination Claim

Under Title VII, it is unlawful "to fail to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). The "ultimate question" in every Title VII case is whether the defendant intentionally discriminated against the plaintiff because of a protected characteristic.[3] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993); Roberson v. Alltel Info. Serv., 373 F.3d 647, 651 (5th Cir. 2004).

---

[3] Plaintiff has also brought a claim for employment discrimination under 42 U.S.C. § 1981. Employment discrimination claims brought under § 1981 are "analyzed under the evidentiary framework applicable to claims arising under Title VII." Lawrence v. Univ. of Tex. Med. Branch at Galveston, 163 F.3d 309, 311 (5th Cir. 1999).

Intentional discrimination may be proven through either direct or circumstantial evidence. Jackson v. Watkins, 619 F.3d 463, 466 (5th Cir. 2010). "[D]irect evidence includes any statement or written document showing a discriminatory motive on its face." Portis v. Nat'l Bank of New Albany, Miss., 34 F.3d 325, 328 (5th Cir. 1994). In determining whether verbal statements constitute direct evidence, courts look to "whether the comments are (1) related to the plaintiff's protected characteristic; (2) proximate in time to the challenged employment decision; (3) made by an individual with authority over the challenged employment decision; and (4) related to the challenged employment decision." Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C., 778 F.3d 473, 475 (5th Cir. 2015). If a plaintiff presents direct evidence of discrimination, "the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor." Id.

When a discrimination claim is supported by circumstantial evidence, the plaintiff must show that he (1) is a member of a protected class, (2) was qualified for the position he sought or held, (3) suffered an adverse employment action, and (4) was replaced by someone outside of the protected group or was treated less favorably than another similarly situated employee outside of the protected group. McCoy v. City of Shreveport, 492 F.3d 551, 556 (5th Cir. 2007).

9

Adverse employment actions "include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." Id. at 559.

If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to provide a non-discriminatory reason for the action. Id. at 562–63. If the employer meets its burden, the burden then shifts back to the plaintiff to show an issue of fact as to whether the employer's proffered reason is pretextual. Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 345 (5th Cir. 2007). "To carry this burden, the plaintiff must rebut each non-discriminatory or nonretaliatory reason articulated by the employer." McCoy, 492 F.3d at 557.

Here, Plaintiff relies on both direct and circumstantial evidence to support his claim. As direct evidence, Plaintiff asserts that Vallier subjected Plaintiff to racial slurs. (Dkt. # 14 at 12; Warthen Dep. 193:4–5.) The only "slurs" Plaintiff identifies, however, are Vallier's statements that Plaintiff "need[ed] to stay in [his] place" and "need[ed] to know who I am." (Warthen Dep. 193:6–17.) These statements are ambiguous and may or may not have been related to Plaintiff's race. However, they were made more than two years before Plaintiff's termination, were isolated in character, and were unrelated to Defendant's decision to terminate Plaintiff, which occurred after Vallier had left the company and arose out of a disagreement over job assignments that immediately preceded Plaintiff's

termination.  Vallier's statements, ill-advised or inappropriate as they may have been, thus do not constitute direct evidence of discrimination against Plaintiff.

In the absence of direct evidence, Plaintiff's discrimination claim must rely on circumstantial evidence.  Plaintiff's circumstantial evidence, however, fails to establish a prima facie case of race discrimination because Plaintiff has presented no evidence that similarly situated employees of other races were treated more favorably.  To be similarly situated, the comparator employee must have "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories."  Lee v. Kan. City S. Ry. Co., 574 F.3d 253, 260 (5th Cir. 2009).  "[C]ritically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions."  Id.

Here, the only adverse employment action at issue is Plaintiff's termination in August 2013.[4]  Plaintiff has presented no evidence of employees of

---

[4] For Title VII and § 1981 discrimination claims, "adverse employment actions consist of 'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating."  Thompson v. City of Waco, 764 F.3d 500, 503 (5th Cir. 2014).  Being required to attend a training class and not being allowed to deliver a load without customer inspection are not ultimate employment decisions, and are thus not adverse employment actions for the purpose of Plaintiff's discrimination claims.

Additionally, Defendant's alleged failure to compensate him for bereavement leave in July 2012 is not actionable because Plaintiff did not file a

other races who engaged in nearly identical conduct but were treated more favorably. There is no evidence in the record that Defendant chose not to terminate a truck transporter where the employee refused to confirm acceptance of a job assignment. There is also no evidence that Plaintiff was replaced by an employee of a different race. Indeed, Plaintiff has offered no evidence of any kind related to Defendant's treatment of other employees in adverse employment actions.

The only evidence of any kind regarding the treatment of other employees is Plaintiff's testimony regarding his inability to deliver a load without inspection on July 31, 2013, and the requirement that he attend a two-day training course in July 2013. With respect to the load delivery, Plaintiff testified that two Caucasian drivers and one Hispanic driver were allowed to deliver loads without customer inspection while Plaintiff was required to wait for the customer's approval. (Warthen Dep. 100:22–103:8.) As noted above, however, not being allowed to deliver a load without customer inspection is not an ultimate employment decision covered under Title VII, and is thus cannot support a prima facie claim of illegal discrimination. Additionally, the record is uncontroverted

---

charge of discrimination until February 26, 2014, more than 300 days after the relevant conduct. See 42 U.S.C. § 2000e-5(e)(1); Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 111–13 (2002). The failure to pay for bereavement leave can be used, however, as background evidence in support of a timely claim. Morgan, 536 U.S. at 113.

that the decision on whether a driver would be allowed to deliver a load subject to inspection is made by the customer, not Defendant.  (Johnson Aff. ¶ 6; Warthen Dep. 103:24–104:3 (testifying that Bowman told him that the decision was out of her control and that she did not have authority to do anything about it).)  As a result, even if it did qualify as an adverse employment action, Plaintiff's inability to deliver a load without inspection would not constitute evidence of discrimination by Defendant.

With respect to the two-day training course, Plaintiff testified that he was the only employee that was required to attend the training.[5]  Again, being required to attend paid training is not an ultimate employment decision and therefore cannot support a prima facie claim of illegal discrimination.  See Hockman v. Westward Commc'ns, LLC, 407 F.3d 317, 331 (5th Cir. 2004) (noting that the Fifth Circuit has held that refusing to allow an employee to attend training is not an ultimate employment decision).  Even if the required training could be said to be an adverse employment action, Plaintiff has submitted no evidence that the other drivers who were allegedly not required to attend the training were similarly situated.  The record contains no information as to whether the other

---

[5] Vallier testified that Defendant retrained approximately 200 drivers on how to mount light bars around the same time.  (Vallier Dep. 12:6–17.)  Defendant argues that Plaintiff was merely the only driver that attended the training on July 20 and 21, 2013, at his particular training location.  Absent evidence specifically supporting that assertion, however, Plaintiff's testimony is likely enough to establish a dispute of fact as to whether other drivers received the training.

drivers shared the same supervisors as Plaintiff, had comparable experience with

regard to the subject of the training—how to mount light bars on the back of the

semi-trucks—or were otherwise not required to attend the training "under nearly

identical circumstances."  See Lee, 574 F.3d at 260.

Plaintiff has thus submitted no evidence that he was treated less

favorably than were other similarly situated employees outside the protected class.[6]

As a result, Plaintiff has failed to establish a prima facie case of race

discrimination, and Defendant is entitled to judgment as a matter of law on

Plaintiff's race discrimination claims.

Further, even if Plaintiff could establish a prima facie case for race

discrimination, Defendant has presented evidence of a legitimate,

non-discriminatory reason for Plaintiff's termination.  The collective bargaining

agreement governing Plaintiff's employment states that "no warning notice need

be given to an employee before he is discharged if the cause of such discharge

is . . . refusal of a work assignment in violation of a mutually agreed dispatch

---

[6] The Court notes that Plaintiff, in his deposition, stated generally that he "was
treated differently than other people were treated" and that things that were
happening to him did not happen to other people.  (Warthen Dep. 178:21–179:1,
180:8–181:8.)  In addition to the fact that this testimony does not indicate that
those treated differently were outside of the protected class, it is unsupported by
any evidence that Defendant treated Plaintiff worse than similarly situated drivers.
"Unsupported allegations . . . or deposition testimony setting forth ultimate or
conclusory facts . . . are insufficient to defeat a motion for summary judgment."
Clark v. America's Favorite Chicken Co., 110 F.3d 295, 297 (5th Cir. 1997).

procedure." (Dkt. # 12-6, art. 23.) On August 1, 2013, Plaintiff was assigned a

breakdown load by central dispatch, and responded that he needed to consult his

union representative on whether he had to take the breakdown load or could

instead be assigned a "home load." (Warthen Dep. 139:14–140:9, 142:15–20.)

When Johnson called Plaintiff on August 2 to ask whether Plaintiff would accept

the assignment, Plaintiff did not confirm that he would take the breakdown load

and repeated that he was waiting to speak with a union representative. (Johnson

Dep. 24:16–25:14, 37:8–38:8; Warthen Dep. 149:18–150:25.) Only after

Plaintiff's repeated failure to accept the load did Johnson and Campbell make the

decision to terminate him pursuant to the collective bargaining agreement.

(Warthen Dep. 151:1–9; Johnson Dep. 19:13–23, 37:24–38:4; Campbell Dep.

13:9–25.)

Plaintiff argues that his testimony that he did not affirmatively refuse

the breakdown load creates a dispute of material fact as to whether Defendant's

reason for termination is pretextual. (Dkt. # 14 at 13.) It is undisputed, however,

that Plaintiff failed to accept the assignment when asked by his supervisor whether

he intended to accept or refuse it. (Warthen Dep. 149:18–150:25.) Even viewing

the evidence in the light most favorable to Plaintiff, the fact that he did not

affirmatively reject the assignment, and instead refused to confirm that he would

accept it, does not suggest that Defendant's real motive in terminating Plaintiff was discriminatory.

Plaintiff also argues that the conflicting evidence regarding where the assigned breakdown load was located creates a material dispute as to whether Defendant's stated reason for termination is pretextual. While Defendant asserts that the breakdown load was in Albany, New York, Plaintiff contends that it was in fact in Asheville, North Carolina. (Johnson Dep. 45:10–22; Warthen Dep. 139:19–23.) Plaintiff argues that this inconsistency undermines the credibility of Defendant's reason for terminating Plaintiff because Plaintiff was in Pennsylvania at the time the load was assigned, and it would not have made sense to send him to a breakdown load in North Carolina.

Plaintiff's argument is unpersuasive. It is undisputed that Plaintiff was assigned the breakdown load, and Defendant's stated reason for Plaintiff's termination is Plaintiff's failure to accept it. The record contains no evidence regarding Defendant's normal business practice when assigning drivers to breakdown loads or how decisions to assign certain drivers to certain breakdown loads are made. There is therefore no basis from which to infer that assigning Plaintiff to a North Carolina breakdown load would have been unusual, and by extension, that the conflicting evidence over where the assigned breakdown load indicates that Defendant's reason for termination was pretextual. Absent such

evidence, the location of the assignment is not probative of whether Defendant's

decision to terminate Plaintiff for failing to accept the load was pretext for racial

discrimination, and is therefore not material to determining whether Plaintiff's

termination reflected racial discrimination on the part of Defendant.  See Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude

the entry of summary judgment.").

　　　　　Finally, Plaintiff argues that all of the complained-of circumstances,

including the failure to pay Plaintiff bereavement leave, being required to attend

light bar training, the inability to deliver a load without customer inspection, and

the fact that he had been on the road for two months without a home load, together

provide evidence that Defendant's reason for terminating Plaintiff was pretextual.

This argument too is unavailing.  First, Defendant's alleged failure to pay

Plaintiff's bereavement leave came over a year before Plaintiff's termination, and

Campbell, the Vice President who approved Plaintiff's termination, did not work

for Defendant at the time Plaintiff took bereavement leave.  There is nothing in the

record that suggests that the bereavement leave issue was in any way connected to

the decision to terminate Plaintiff.  Second, accepting as true Plaintiff's testimony

that he was the only driver to be required to receive light bar training, there is no

evidence in the record to suggest that the requirement had anything to do with

17

Plaintiff's race.  Plaintiff has submitted no evidence regarding the racial

composition of Defendant's drivers, and so even if the training requirement was

limited to Plaintiff, there is no basis on which to infer that Plaintiff was singled out

because of his race.

Third, as discussed above, the record shows that the decision on

whether a driver may deliver a load without customer inspection is made by the

customer, and Plaintiff's inability to deliver a load on July 31, 2013, thus provides

no support for the existence of any discriminatory intent on the part of Defendant.

Finally, while it is uncontested that Plaintiff had been on the road for long enough

to be entitled to a home load, the record also shows that Plaintiff turned down

opportunities to take a home load in the hope that he would later find a load that

would get him closer to his home in Las Vegas so that he could avoid the cost of

paying for his own flight back to the east coast.  (Warthen Dep. 160:14–162:7.)

There is no evidence that Plaintiff's extended time on the road prior to his

termination was at all related to his race.

In sum, there is no evidence in the record that Plaintiff's termination,

or any of the other incidents he complains of, had anything to do with his race.

Plaintiff has submitted no evidence indicating that he was treated differently than

other similarly situated employees outside of the protected class, and thus has

failed to state a prima facie claim of discrimination.  Plaintiff has also failed to

produce "substantial evidence" indicating that the proffered legitimate

nondiscriminatory reason is a pretext for discrimination, see Burton v. Freescale

Seminconductor, Inc., 798 F.3d 222, 233 (5th Cir. 2015), and lacking any evidence

of pretext, Defendant is entitled to judgment as a matter of law on Plaintiff's

discrimination claims on this basis as well.  The Court therefore **GRANTS**

Defendant's Motion for Summary Judgment on Plaintiff's discrimination claims.

II.     Retaliation Claim

         In order to establish a prima facie case of retaliation, a plaintiff must

show that "(1) [he] engaged in a protected activity; (2) an adverse employment

action occurred; and (3) a causal link exists between the protected activity and the

adverse action."  Haire v. Bd. of Supervisors of La. State Univ. Agric. & Mech.

Coll., 719 F.3d 356, 367 (5th Cir. 2013).  In the context of a retaliation claim, an

adverse employment action is an action that would have dissuaded a reasonable

worker from making or supporting a charge of discrimination.  Burlington N. &

Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).  If a prima facie case is

established, the burden shifts to the employer "to articulate a legitimate . . .

nonretaliatory reason for its employment action."  McCoy, 492 F.3d at 557.  If the

employer meets this burden, the plaintiff must show that the employer's proffered

reason is a pretext for a retaliatory purpose by rebutting each nonretaliatory reason

articulated by the employer.  Id.

Plaintiff has submitted evidence that he engaged in protected activity by filing a formal grievance with the union alleging harassment and race discrimination on June 20, 2013.  (Warthen Dep. 68:20–69:9.)  Of the actions complained of by Plaintiff as retaliatory, only Plaintiff's termination on August 2, 2013, qualifies as an adverse employment action.  With regard to the light-bar training that Plaintiff was required to attend on July 20 and 21, 2013, Plaintiff was compensated for the training time, albeit at a lower rate than he was paid as a driver.  (Warthen Dep. 82:22–83:6.)  The Court finds that a compensable two-day training requirement would not dissuade a reasonable employee from making a discrimination claim, and thus that the training requirement was not materially adverse.  See Aryain v. Wal-Mart Stores Tex. LP, 534 F.3d 473, 484–85 (5th Cir. 2008) (noting that the materiality requirement reflects the importance of separating "significant from trivial harms").  With respect to Plaintiff's inability to deliver a load without customer inspection on July 31, 2013, the record evidence, as noted above, indicates that the decision to allow a driver to deliver a load without customer inspection is made by the customer, not Defendant.  (See Johnson Aff. ¶ 6.)  While Plaintiff testified that white and Hispanic transporters were able to deliver loads subject to inspection at the same site while he was forced to wait, there is no dispute that the decision to inspect Plaintiff's load prior to delivery was

not made by Defendant.  Thus, even if such conduct qualified as an adverse

employment action, it could not support a retaliation claim against Defendant.

      While termination is undoubtedly an adverse employment action, <u>see</u>

<u>Sherrod v. Am. Airlines, Inc.</u>, 132 F.3d 1112, 1122 (5th Cir. 2015), Plaintiff has

failed to show a causal link between his protected activity and his termination.  "In

order to establish the causal link between the protected conduct and the illegal

employment action . . . the evidence must show that the employer's decision to

terminate was based in part on knowledge of the employee's protected activity."

<u>Id.</u>  Plaintiff has presented no evidence that either Johnson, the San Antonio

terminal manager, or Campbell, the Vice President of Operations whom Johnson

consulted on the firing decision, knew of Plaintiff's grievance filed with the union

on June 20, 2013.[7]  The testimony of Johnson and Campbell indicates instead that

they were unaware of Plaintiff's discrimination complaint.  (Campbell Dep. 16:8–

12; Johnson Dep. 38:9–13.)  Absent evidence that the superiors who made the

decision to terminate Plaintiff knew of the grievance filed with the union, Plaintiff

has failed to establish a prima facie claim that Defendant retaliated against him for

engaging in protected activity.[8]  The Court finds that there is no genuine dispute of

---

[7] The Court notes that the grievance itself is not in the record; its existence is
supported by Plaintiff's deposition testimony.  (Warthen Dep. 68:20–69:9.)

[8] Additionally, the Court's above discussion of Defendant's legimate,
non-discriminatory reason for terminating Plaintiff applies equally here.

material fact as to the causal link between Plaintiff's termination and his protected activity, and that Defendant is entitled to judgment as a matter of law on Plaintiff's retaliation claim.  The Court therefore **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's claim for retaliation.

<u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (Dkt. # 12).

**IT IS SO ORDERED.**

**DATED:** San Antonio, Texas, October 7, 2015.

_____
David Alan Ezra
Senior United States Distict Judge

---

Defendant has presented evidence that it terminated Plaintiff for failing to accept an assignment pursuant to the terms of the collective bargaining agreement, and Plaintiff has presented no evidence that this stated reason for his termination is in fact pretext for impermissible discrimination.  As a result, even if Plaintiff had established a prima facie claim for retaliation, Defendant would still be entitled to judgment as a matter of law on this basis.